Cite as 2025 Ark. App. 107

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR-24-67

| | | |
|---|---|---|
| JOE BETHUNE | | |
| | APPELLANT | Opinion Delivered February 19, 2025 |
| V. | | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23CR-22-1170] |
| STATE OF ARKANSAS | | HONORABLE TROY B. BRASWELL, |
| | APPELLEE | JR., JUDGE |
| | | AFFIRMED |

**MIKE MURPHY, Judge**

A Faulkner County jury convicted appellant Joe Bethune of second-degree battery and sentenced him to twelve years' incarceration. Bethune was also charged with having acted in concert with two or more persons and being a habitual offender with four or more prior felony convictions. His convictions stemmed from a riot at the Faulkner County Detention Center on December 16, 2021. On appeal, Bethune challenges the sufficiency of the evidence; argues that the court erred in admitting evidence of him passing a weapon to another inmate; and argues that the court erred in refusing to admit testimony regarding motive of the State's witnesses to lie. We affirm.

A jury trial was conducted on September 7, 2023, and established the following. While gathering trustees to serve dinner to other inmates, Sergeant William Lipsmeyer

noticed that a blanket had been placed over a door window to one of the jail pods. This prevented detention officers from monitoring what went on inside the pod from "the tower," a centrally located office within the jail. Lipsmeyer went to investigate. When he arrived at the pod, he noticed that the door lock was faulty, so he kept his foot in the doorway to keep it from closing and locking behind him. Once inside the pod, Lipsmeyer discovered that two inmates—Thomas Jaquez and Michael Champaign—were fighting. When he drew his taser and ordered them to stop, Bethune, along with another inmate, Shelby Stivers, "rushed him," and Bethune demanded that he "get out of there," declaring that the inmates "handled their own business in their pods[.]" In trying to create distance between them, he moved his foot and got locked inside the pod.

At some point, Bethune jumped on Lipsmeyer's back and hit him and tried to choke him. Lipsmeyer testified he was able to get Bethune off his back and put him on the ground. When he put his weight on Bethune, Bethune told him he gave up. As Lipsmeyer was getting off of Bethune to get his handcuffs, Bethune kicked him. Lipsmeyer then tased him.

Sergeant Volkman testified that he and others were radioed to help Lipsmeyer. Volkman said when they arrived at the pod, "there was an energy" and "[e]verything kind of seemed off." Upon entering, the inmates were told to "catch the wall," meaning they should move away from the officers and stand or sit by the wall. However, no one did. According to Volkman, there were two inmates, Bethune and Isaac Keathley, instigating the conflict. When Volkman attempted to handcuff Bethune, he was attacked by another inmate, Jason Heath. Volkman attempted to fire his taser at Heath, but it malfunctioned, so he was forced

2

to go "hands-on." During the struggle, Volkman used pepper spray on Heath. As a result of his encounter with Heath, Volkman's shoulder bone separated from his rotator cuff. At the time of trial, Volkman had regained only 80 percent function in his shoulder.

Volkman further testified that he saw Lieutenant Roper engaged with an unidentified inmate when Keathley came up behind Roper and kicked the back of his knee. Roper fell to the floor, turned pale, and attempted to crawl out of the pod.

As Volkman was escorting Heath out, Bethune was putting spoons and other items in the door to prevent officers from getting back into the cell. He heard Bethune screaming profanities, including "Fuck you pigs" and "You are not coming into the cell." Volkman retrieved the "less-lethal" shotgun, which ejected foam rounds. Everyone then complied with the command to go back to their pods or to the wall. The officers were then able to handcuff Bethune and Keathley.

Deputy Sheldon White testified that upon making entry into the cell, he saw Bethune attacking Lipsmeyer while he was dealing with inmate Stivers. White testified that Lipsmeyer was able to use his taser and hit Bethune, but in the middle of doing so, Lipsmeyer was punched by Keathley, causing him to lose control of the taser. White was able to regain control of the taser, and that is when Roper, Lipsmeyer, and Volkman arrived to help control the situation. White said multiple people were involved but that Keathley and Bethune were causing the most harm.

Lieutenant Terry Roper testified he was almost immediately taken down by a kick to his knee. He recalled that while on the ground, there was fighting and scrambling going on

behind him until he was eventually pulled out of the pod by inmate Stivers and another officer. He testified there was no recording of the incident because the cameras had stopped working, and the new ones had not yet arrived.

At the close of the State's evidence, Bethune moved for a directed verdict. Specifically, Bethune argued that, while there was testimony that he hit Sergeant Lipsmeyer, the State had failed to show that his assault caused Lipsmeyer's injuries. Bethune also challenged the proof that he was the instigator of the chaos.

The court denied the motion, and defense counsel announced that Bethune would testify. Defense counsel informed the circuit court that Bethune intended to testify regarding a civil lawsuit that he had filed immediately after the incident at the jail. He contended the lawsuit was motivation for the officers to testify against him. The circuit court ruled that a civil lawsuit was not relevant and excluded it.

Bethune testified that the incident started with a fight between two other inmates in the pod. He said Stivers and Heath were holding a blanket over the front window so the officers could not see inside. Bethune testified that because he is an older inmate, he tries to guide and calm the others. Bethune testified he was trying to break up the fight and explain to Sergeant Lipsmeyer that he and Stivers had it handled because they did not want anyone to get into trouble. He explained that once the other officers arrived, it "blew up from there." Bethune further testified that during the "tussling," he "may have hit [Sergeant Lipsmeyer] inadvertently." However, he claimed he never "swung and hit the man" or jumped on his back. Bethune explained he was not resisting arrest; rather, he was avoiding

4

getting injured by Sergeant Lipsmeyer's roughness. Bethune said, "I wouldn't plan nothing like that against law enforcement. I never have."

Prior to the State's cross-examination, the circuit court, out of the hearing of the jury, considered the State's request to cross-examine Bethune regarding an incident in which he passed a shank to another inmate. The State sought to use this evidence to rebut Bethune's testimony of his good character and that he had never done anything to hurt a law enforcement officer. Bethune argued that the evidence was not relevant because he was testifying about his conduct only in this specific incident and that his passing the shank to another inmate was not directed at law enforcement. The circuit court, after taking a short recess to review the tape of Bethune's testimony, reconvened the trial and ruled that the State was allowed to rebut his claims.

On cross-examination, Bethune admitted that both Lieutenant Roper and Sergeant Volkman had substantial injuries following the riot and that Sergeant Lipsmeyer may have sustained minor injuries when the two of them were "tussling." Bethune also admitted that he had been tased by Sergeant Lipsmeyer and that there "were several altercations" going on inside the pod.

Bethune was cross-examined about the statement he gave to investigators shortly after the riot. While Bethune testified at trial that Jacquez and Champaign were the ones who were originally fighting, he initially told investigators that he was the one fighting with Jacquez. Regarding his prior statement, Bethune admitted that, before the riot occurred, he and "four of five" of the other inmates had been drinking homemade alcohol made by one

of the inmates. Bethune testified that he "resisted the officer once the incident started" and that he "violate[d] a rule by not complying . . . [and] should have just went ahead and caught the wall, caught handcuffs." Bethune also admitted having received a string of prior felony convictions since 2018. Bethune denied that he said "Fuck you pigs. Y'all aren't coming in here."

After affirming his statement on direct-examination that he tried to "guide [the younger inmates] as situations come in[,]" Bethune was questioned regarding the incident in which he passed a shank to another inmate charged with the capital murder of a detention officer. Bethune said that he had actually handed the other inmate a tape measure and said, "[W]hat I gave him, I got back from him; and, I threw it back in the closet." Bethune admitted that going into the closet in the first place was a rule violation of the jail.

At the conclusion of all the evidence, Bethune rested his case and renewed his motion for directed verdict. The circuit court again denied the motion.

The jury was instructed on the elements of second-degree battery and accomplice liability. Following arguments of counsel, the jury retired to deliberate and returned its verdict, finding Bethune guilty of second-degree battery. The jury also affirmatively indicated on the verdict form that Bethune "had acted in concert with two or more other persons beyond a reasonable doubt in the commission of Battery in the Second Degree."

The case proceeded to the sentencing phase, wherein the jury recommended that Bethune be sentenced to twelve years in prison. On the State's motion, the circuit court

6

ordered that Bethune's sentence be served consecutively to any sentence imposed previously. The circuit court granted the motion and sentenced him accordingly. This appeal followed.

On appeal, Bethune argues that the State erred in denying his motion for directed verdict on the second-degree-battery charge. To support his argument, he asserts that he only "participated in the squabble that day" and that no evidence was offered to the point that he "aided or encouraged or committed a Battery II."[1]

Motions for directed verdict are treated as challenges to the sufficiency of the evidence. *Maina v. State*, 2025 Ark. App. 38, at 4, ___ S.W.3d ___, ___. In a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the State and consider only the evidence that supports the conviction. *Id.* The appellate courts determine whether the evidence was substantial. *Id.* Evidence is sufficient if it is of such character and force that it, with reasonable certainty, compels a conclusion one way or the other without resort to speculation or conjecture. *Id.* The credibility of witnesses is an issue for the jury. *Kinsey v. State*, 2016 Ark. 393, 503 S.W.3d 772. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

Arkansas Code Annotated section 5-13-202(a)(4)(A) (Repl. 2024) provides that a person commits second-degree battery if the person knowingly, without legal justification,

---

[1]Bethune's sufficiency-of-the-evidence challenge is in his third point on appeal, but double-jeopardy concerns require us to address the sufficiency of the evidence before addressing other points on appeal.

causes physical injury to or incapacitates a person he or she knows to be a law enforcement officer while the officer is acting in the line of duty. A physical injury is defined as impairment of physical condition; infliction of substantial pain; or infliction of bruising, swelling, or visible marks associated with physical trauma. Ark. Code Ann. § 5-1-102(14) (Repl. 2024).

In cases implicating a theory of accomplice liability, we will affirm if there is substantial evidence that the defendant acted as an accomplice in the commission of the alleged offense. *Smith v. State*, 2022 Ark. 95, at 7–8. A person acts as an accomplice of another person if, with the purpose of promoting or facilitating the commission of the offense, the person aids, agrees to aid, or attempts to aid in planning or committing the offense. *See* Ark. Code Ann. § 5-2-403(a)(2) (Repl. 2024). Relevant factors in determining the connection of an accomplice to a crime are the presence of the accused in proximity to a crime, the opportunity to commit the crime, and an association with a person involved in a manner suggestive of joint participation. *Gilcrease v. State*, 2009 Ark. 298, at 12, 318 S.W.3d 70, 79. A defendant is an accomplice if he or she renders the requisite aid or encouragement to the principal with regard to the offense at issue. *Id.*

The State presented evidence that Bethune participated in and committed second-degree battery. Sergeant Lipsmeyer had to radio for backup because Bethune, along with inmate Stivers, "rushed him" and demanded that Lipsmeyer "get out of there," declaring that the inmates "handled their own business in their pods[.]" Bethune was seen putting items in the door to prevent other officers from getting into the pod. Bethune further

8

encouraged other inmates to prevent the officers from entering the pod and used force to do so while "yelling, screaming profanity, and saying, 'Fuck you pigs. You are not coming into the cell.'" Multiple officers testified Bethune was one of the inmates who initially would not comply and instigated the conflict.

Additionally, these actions resulted in physical injuries to multiple officers. Sergeant Lipsmeyer's struggle with Bethune resulted in his sustaining injuries that included contusions and swelling on the left side of his face. He experienced substantial pain for about a week that he likened to being in a car wreck. Sergeant Volkman testified that, when he went to assist Sergeant Lipsmeyer, Bethune started hitting him as well and that his struggle with another inmate resulted in injury to his shoulder. Lieutenant Roper testified he still has pain every day from his knee injury, and he cannot do a lot of activities that he did before.

As noted above, the credibility of witnesses is an issue for the jury, and it is free to believe all or part of any witness's testimony. *Wood v. State*, 2024 Ark. App. 601, at 5, ___ S.W.3d ___, ___. Further, the uncorroborated testimony of one State witness is sufficient to sustain a conviction. *Id.* Here, the jury believed the officers' testimony and found Bethune guilty of second-degree battery. We hold that the evidence above, viewed in the light most favorable to the State, constitutes substantial evidence of Bethune's participation as an accomplice in the battery.

Next, Bethune argues that the court abused its discretion when it allowed cross-examination concerning Bethune's passing a shank to another inmate. A circuit court has broad discretion in deciding evidentiary issues, and its decisions are not reversed absent an

abuse of discretion. *Moore v. State*, 2023 Ark. App. 577, at 2–3, 680 S.W.3d 472, 473–74. An abuse-of-discretion standard is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Id.*

The circuit court did not abuse its discretion by concluding that Bethune opened the door to the admission of evidence about his character for peacefulness and being law abiding. As our supreme court explained in *Smallwood v. State*, 326 Ark. 813, 819, 935 S.W.2d 530, 533 (1996):

> This court has recognized that a defendant may "open the door" to an otherwise impermissible inquiry in *Larimore* [*v. State*, 317 Ark. 111, 120, 877 S.W.2d 570, 574 (1994)], where we said:
>
>> We have recognized that otherwise inadmissible testimony may be offered when one party has opened the door for another party to offer it. This is most often permitted when a defendant has been untruthful about a former crime or *has brought up otherwise inadmissible character evidence which the State may then rebut.*
>
> *Larimore, supra*. By claiming that he was not the "type of person" to threaten someone with a knife, Smallwood placed his propensity towards violence in issue. Thus, the trial court properly allowed the State to question Smallwood about other violent acts or threats. *Larimore, supra.*

The same "open-the-door" argument prevails here. Bethune's direct-examination testimony regarding his purported mentorship of younger inmates as well as his declaration that he would never plan to do anything harmful to law enforcement and never had, opened the door to the State's inquiry regarding this prior incident. By putting his character in issue and testifying to specific instances of his character as well as denying that he had ever done

anything detrimental to law enforcement, the State was entitled to rebut assertions he had made on direct examination. Thus, the circuit court properly allowed the State's line of questioning.

Last, Bethune argues the court abused its discretion when it ruled that testimony regarding the civil lawsuit he had filed was irrelevant to the proceedings. This claim is not preserved.

To challenge a ruling excluding evidence, an appellant must proffer the excluded evidence so we can review the circuit court's decision, unless the substance of the evidence is apparent from the context. *Haltiwanger v. State*, 322 Ark. 764, 767, 912 S.W.2d 418, 420 (1995). Absent a proffer, this court has no means of determining if prejudice occurred. *Id.* The failure to proffer evidence so that the appellate court can make that determination precludes review of the issue on appeal. *Id.*

Affirmed.

VIRDEN and GLADWIN, JJ., agree.

*Hogue Corbitt & Ward PLC*, by: *David R. Hogue*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

11